ELIZABETH L. PERRIS
CHIEF BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1536

DIANE K. BRIDGE, LAW CLERK
MARGOT LUTZENHISER, LAW CLERK

# NOT FOR PUBLICATION

April 10, 2008

Christine A. Kosydar
Stoel Rives LLP
900 SW Fifth Ave., Ste. 2600
Portland, OR  97204

James Ray Streinz
McEwen Gisvold LLP
1100 SW Sixth Ave., Ste. 1600
Portland, OR  97204

>  Re:   Columbia Aircraft Manufacturing Corp., Case No. 07-33850-elp11
>         Application for Final Compensation of ING Financial Markets LLC

Dear Counsel:

The purpose of this letter is to give you my ruling on those legal issues that can be decided at this time, thereby clarifying the issues that will be included in the evidentiary hearing on ING Financial Markets LLC's (ING) application for final compensation.

ING seeks allowance of $1,100,00.00 in fees, consisting of the success fee of $1,150,000 provided in its engagement agreement with debtor less a $50,000 retainer already paid, plus $26,004.51 in expenses.[1]  The unsecured creditors' committee (committee) objects to approval of any compensation beyond what ING has already been paid.

Having reviewed the committee's objection and ING's reply, I conclude that there are some legal issues that I can decide before the evidentiary hearing.  First, I can resolve the legal standard that will be applied to determine the amount of allowable fees for ING.  Second, I can resolve at least some of the issues the committee has raised regarding whether ING did the work

---

[1]      This amount is based on the itemization attached to the Declaration of Philip M. Comerford, which has been adjusted to reflect coach airfare prices as of the actual date of travel. It appears that the request for expenses has dropped from the $30,629.11 in the original application to $26,004.51.

that it agreed to do.  Finally, I can resolve some issues about expenses.  I can decide whether ING can be reimbursed for the time its counsel spent preparing the fee application, whether the expense itemization is adequate, and whether ING's use of the recreated cost of coach airfare in its request for reimbursement is adequate.

1.      Legal standard

        Debtor retained ING prepetition to provide financial advisory and investment banking services, which ING did.  After debtor filed chapter 11, debtor sought to assume the contract with ING.  I denied that request, but approved postpetition employment of ING, pursuant to 11 U.S.C. § 327.[2]  The order authorizing employment provided that compensation to be paid to ING for its professional services and expenses would be determined by the court "in accordance with [section] 330 of the Bankruptcy Code."  Order Authorizing Employment of ING Financial Markets LLC.  Therefore, any compensation to be paid on ING's application for final compensation must meet the standards for compensation set out in § 330.

        Section 330(a) allows a court to award to a professional employed under § 327:

> (A) reasonable compensation for actual, necessary services rendered by the . . . professional person . . .; and
>
> (B) reimbursement for actual, necessary expenses.

The Code provides guidance on how to determine whether compensation requested is reasonable:

> (3) In determining the amount of reasonable compensation to be awarded to [a] . . . professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including --
>
> > (A) the time spent on such services;
> >
> > (B) the rates charged for such services;
> >
> > (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

----

[2]      All chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

§ 330(a)(3). Subsection (a)(4) directs courts not to allow compensation for unnecessary duplication or for services that were not "reasonably likely to benefit the debtor's estate" or "necessary to the administration of the case." § 330(a)(4)(A).

The committee recognizes that courts often look at market rates in order to determine whether a particular professional's charges are reasonable. The committee argues that market rate is the wrong legal standard to apply in this case, however, because § 330(a)(3) lists as a factor for the court's consideration "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." § 330(a)(3)(F) (emphasis supplied). According the committee, this means that the court must look not at what similar professionals charge for similar services outside bankruptcy, but instead what those professionals would charge for litigation in other types of cases.

I disagree with the committee's argument. The idea behind the factors set out in § 330(a)(3) is that professionals should not be paid an arbitrarily low rate in bankruptcy cases (in order to preserve the estate), but instead should be paid comparably to rates they would receive outside bankruptcy, so professionals will be willing to serve in bankruptcy cases. In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991). There is no authority for limiting the market to litigation; many bankruptcy professionals, including attorneys, do not engage in litigation but instead are business lawyers or other professionals who rarely litigate in court. Thus, I conclude that the relevant market rate is the rate charged outside the bankruptcy context by comparably skilled investment bankers. Accord In re Buckridge, 367 B.R. 191, 205 n.24 (Bankr. C.D. Cal. 2007) ("In bankruptcy cases, the hourly rate must compare favorably to the rate that would be charged by 'comparably skilled' attorneys for similar services rendered in a non-bankruptcy context.").

Second, the committee argues that the court must take into consideration not only whether the services provided by ING were reasonably likely to benefit the estate at the time rendered but also what the professional actually did and the final results of its work.

In In re Garcia, 335 B.R. 717 (9th Cir. BAP 2005), the panel considered what legal standard should apply to a determination of whether services were necessary or beneficial to the estate. It discussed an earlier case, In re Mednet, 251 B.R. 103 (9th Cir. BAP 2000), explaining that, in Mednet,

> [w]e rejected a standard that services are only compensable if they result in a material benefit to the estate because [that] does not comport with the clear meaning of the statute. Instead, a professional need demonstrate only that the services were reasonably likely to benefit the estate at the time rendered.

Garcia, 335 B.R. at 724 (citations omitted). The panel went on to say that, in making that determination, the court must also look at

> the circumstances and manner in which services are performed and results achieved to determine a reasonable fee. Such examination includes:
>
> (a) Were the services authorized?
>
> (b) Were the services necessary or beneficial to the administration of the estate at the time they were rendered?
>
> (c) Are the services adequately documented?
>
> (d) Are the fees required reasonable, taking into consideration the factors set forth in section 330(a)(3)?
>
> (e) In making the determination, the court must consider whether the professional exercised reasonable billing judgment.

Id. (citations omitted.)

Thus, although actual material benefit to the estate is not a prerequisite to compensation, the professional must show that the fees charged for its services were reasonable under the circumstances, which includes consideration of the manner in which the services were performed. Certainly whether the services harmed rather than benefitted the estate is relevant to whether fees were reasonable and necessary.

2.      Specific issues as to quality of ING's work

In its objection to debtor's application to employ ING, the committee raised certain "reservations and concerns," which it repeats in its objection to ING's fees. Many of the objections relate to services ING provided prepetition. Normally the court would not consider

prepetition services in determining the amount of ING's allowable administrative claim. This situation is different, however, because the employment order provides:

> 3. Debtor's requests to assume the Engagement Agreement pursuant to Section 365 of the Bankruptcy Code and to employ ING under Section 328(a) of the Bankruptcy Code are denied. Notwithstanding such denial, all services provided to Debtor by ING since November 30, 2006 may be considered in approving compensation requested by ING regardless of whether such services were performed before or after September 24, 2007, the date these bankruptcy proceedings were commenced.

Order Authorizing Employment of ING Financial Markets LLC at 2-3.

Some of the committee's objections can be disposed of summarily; some cannot.

A.     ING failed to provide the guidance that a turnaround consultant or other financial advisor would have provided.

ING responds that it was not hired to provide turnaround services and never held itself out to be a turnaround specialist. It argues that it was hired to provide investment banking services, which it did, and that it even advised debtor to hire a turnaround specialist when it became familiar with debtor's finances and future prospects.

The engagement letter provides that ING was being hired to provide financial advisory and investment banking services "in connection with the possible sale, merger, consolidation, reorganization or other business combination, or similar transaction involving all or a substantial portion of the business, assets or debt of the Company[.]" ING was to analyze, among other things, debtor's financial condition and to make a recommendation based on that analysis (Phase I), and to "advise the Company with respect to the structure and financial terms of a possible Transaction and the negotiating strategy to be used in connection therewith."

There is a factual question about whether the services ING provided were adequate under the contract. Although I agree that ING was not hired to be a turnaround consultant, it was hired to provide financial advice and investment banking services in connection with a possible sale of debtor's assets. It is not clear what the parties intended that advice and those services to include.

B.     ING delayed too long in determining the nature of debtor's finances and the need to sell debtor.

ING disputes that it was hired to determine whether debtor's business needed to be sold. But, as I have said, it was hired to make a recommendation about a possible sale after analyzing debtor's finances and other relevant circumstances. Again, the agreement is not clear enough to

allow me to hold as a matter of law that advice about whether debtor's business needed to be sold was outside the scope of ING's engagement.

        C.      <u>ING took too long to create the "book" for contacting purchasers and the book did not adequately explain debtor's value to potential buyers</u>.

        ING does not respond to the complaint that it took too long to create the book. It explains that it was not hired to do an appraisal or to value the company, so cannot be held accountable for failing to explain the company's value to potential buyers.

        The timeliness with which ING produced the book and the alleged delay's effect on debtor's financial situation is not something that can be judged without evidence. As for whether ING adequately explained debtor's value to potential buyers, the engagement letter requires ING to "advise the Company with respect to the structure and financial terms of a possible Transaction" and to assist debtor in preparing information for distribution to potential buyers describing, among other things, debtor's "financial condition and prospects." The agreement also says that ING has no obligation to do any independent evaluation or appraisal of debtor's assets or liabilities.

        The committee's complaint that the book failed to adequately describe the value of the company does not necessarily mean that ING had to do an independent appraisal. It was hired to advise about the structure and financial terms of a possible sale, and to describe for prospective buyers debtor's financial condition and prospects. That includes explaining the value of the company, based on the information debtor provided. The committee will be allowed to present evidence about this allegation.

        D.      <u>ING refused to stand up to the owners of debtor and demand certain actions</u>.

        I agree with ING that there is no basis for this allegation. There is nothing in the engagement letter that requires ING to "stand up" to debtor's owners and demand anything. The committee will not be allowed to present evidence on this allegation.

        E.      <u>ING initially sought investment or stock purchase for debtor rather than pursue a sale of debtor's assets</u>.

        The committee says that an asset sale such as the one that occurred to Cessna should have been the obvious goal from the start. The agreement requires ING to give advice about a possible transaction. I agree with ING that the decision whether to pursue a sale or some other financial assistance is up to management, not to the investment banker. The committee will not be allowed to present evidence about this allegation.

F.      ING refused to set a reasonable value for debtor that would attract bidders, and referred potential buyers to the balance sheet, which did not include debtor's most valuable asset.

This allegation is similar to C. above: ING agreed to advise about the terms of a sale and the financial condition of debtor.  If ING's assessment of a price was not reasonable and therefore failed to attract possible purchasers, that fact would be relevant to whether the fees it charged for its services were reasonable.  The committee will be allowed to produce evidence about whether ING's advice about the terms of the sale and debtor's financial condition was competent.

G.      ING entered into a bad deal with Cessna.

ING responds that it did not enter into any deal with Cessna; debtor did.  Of course that is true, but it was ING's obligation to advise about that transaction.  If ING advised debtor to enter into an agreement that included terms that were harmful rather than helpful to debtor, that fact would affect whether the fee ING charged is reasonable under the circumstances.  The committee will be allowed to present evidence about the quality of ING's advice with regard to the Cessna sale.

3.      Expenses

A.      Detailed schedule of costs and expenses

The committee complains that ING has not provided enough information to allow a determination of whether the expenses ING claimed were necessary, and asks for an itemization of the costs.  In response, ING has filed the Declaration of Philip Comerford, which breaks out the various expenses by week, by the individual incurring the expenses, and generally by purpose of the expense.  The committee says that it did not receive the detailed statement of expenses.  I conclude that the detail provided is adequate.

B.      Airfares

The committee complains specifically about airfares.  It argues that ING's approach of simply obtaining information from the airline as to the price that was available for full coach fare on the date of travel is not sufficient to show what the actual cost of airfare would have been had ING's representatives flown coach instead of business class.

ING's provision of information from the airlines about what the full coach fares were on a particular day of travel is sufficient.  Although prices certainly fluctuate, ING should be reimbursed for the lesser of its actual costs or the coach fare, determined by using the best source of available information, which is the airline.  To the extent that the committee objects

that ING should have obtained the coach fare available on the date it purchased the ticket, rather than the date of the flight, the objection is overruled.

#### C. Attorney fees for preparing fee application

Finally, the committee argues that ING cannot be reimbursed for the fees it paid its counsel to prepare the fee application. ING argues that it is entitled to be reimbursed for the cost of preparing the fee application under § 330(a)(6). That subsection provides that "[a]ny compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application." ING argues that the fees should be allowed because, if its own counsel had not prepared the fee application, debtor's counsel would have had to do it, and debtor would have to pay for that expense.

I agree with the committee that debtor is not liable for attorney fees charged by ING's lawyers for preparing the fee application. Section 330 governs compensation of professionals employed under § 327, including actual and necessary expenses. Although ING was appointed under § 327, ING's counsel was not. ING's counsel does not represent the trustee or the estate and thus is not entitled to fees under § 330. ING does not explain how debtor should be liable for legal expenses incurred by ING, other than under the contract with debtor. It is doubtful whether the contract, which was rejected, has any application in determining whether ING can recover as an administrative expense fees charged by the lawyers representing it in this fee dispute. Even if it is applicable, the contract requires prior written consent of debtor. ING does not argue that it had prior written consent of debtor. Therefore, the $4,520 in expenses for ING's lawyer's fees for preparing the fee application will be disallowed.

#### CONCLUSION

ING argues that its fee application should be approved as a matter of law, with no need for an evidentiary hearing. As is clear from the discussion above, there are factual questions that need to be resolved through an evidentiary hearing. A scheduling conference will be held on April 16, 2008 at 10:00 a.m. in Courtroom No. 1 to discuss the evidentiary hearing.

Very truly yours,

ELIZABETH L. PERRIS
Bankruptcy Judge

cc:    Leon Simpson
       UST